Filed 7/13/15  J.M. v. Superior Court CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| J.M.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN MATEO COUNTY,<br><br>        Respondent;<br><br>SAN MATEO COUNTY HUMAN SERVICES AGENCY,<br><br>        Real Party in Interest. | A144929<br><br>(San Mateo County<br>Super. Ct. No. JV83339) |

J. M. (Mother) petitions for extraordinary relief under California Rules of Court, rule 8.452, asking us to set aside the juvenile court's order setting a hearing pursuant to Welfare and Institutions Code[1] section 366.26.  We shall deny the petition on the merits.

## I.  BACKGROUND

### A. Initial Petition

In September 2013, the San Mateo County Human Services Agency (the Department) filed a petition pursuant to section 300 on behalf of J.S. (Minor), then seven years old.  The petition alleged Mother had an ongoing pattern of exposing Minor to domestic violence present in Mother's relationships with her current and former boyfriends.  The petition also alleged Minor had been left unsupervised for hours at a

_____

[1] All statutory references are to the Welfare and Institutions Code.

1

time, that she walked to school alone, that she had been absent from school or tardy many times, and that the family's home was uninhabitable and hazardous. Mother and her current boyfriend, E.N., had refused to accept services offered by the Department because they did not believe in government intervention.

According to the initial petition report, Mother had lost her parental rights to an older child in 2005, after she neglected her physically while she lived with her in the home of her then-fiancé, who operated a methamphetamine laboratory from his home. The older child had been exposed to methamphetamine.

Minor tested positive for methamphetamine at her birth in 2006. In 2011, Contra Costa County Children and Family Services received a referral stating that Minor was being exposed to domestic violence, that she and Mother had been staying at a domestic violence shelter, and that Mother had left the shelter and was living with a man and abusing substances. Upon investigation, it appeared that Minor was staying with a friend and was adequately cared for at the time. Mother refused any services for her substance abuse.

In 2012, Riverside County Child Protective Services (CPS) received a referral stating that Mother was a drug addict and was staying at a drug house in Richmond, and that Minor was living with a family friend in Riverside County with Mother's permission. Before Minor began living with the family friend, Mother failed to get Minor to school regularly; Minor had missed 53 days of school the previous year. According to the referral, Mother was "using drugs, homeless, and hopping from guy to guy," and in the previous year had been involved in a relationship marked by domestic violence with a man who almost killed her. Riverside County CPS did not make contact with the family and closed the referral as inconclusive.

In January 2013, police officers were called to the family's home as a result of a disturbance. An officer described the home as uninhabitable. It had exposed wiring, holes in the walls, and a bathroom that did not appear to be functioning. There was a crack pipe on the table. The officer was not aware of any children in the home and did not report the matter to CPS.

2

In June 2013, the Department received a report that Minor had been seen playing in a playground by herself for several hours. Minor said she often walked around the neighborhood by herself. A social worker and a police officer visited the home. E.N. opened the window, and Mother approached the window. Mother was angry and asked, "[W]hat the fuck do you want and why is CPS in my business?" She denied that there were any hazards in the home and said she would not allow anyone into the home without a warrant. Mother acknowledged having been involved in violent relationships, starting with the father of her older child. The last man she was involved with before E.N. was extremely abusive, and Minor witnessed the abuse. Mother denied any current domestic violence with E.N. She admitted having abused methamphetamines in the past, but said the last time she had done so was when she was pregnant with Minor. She refused to take a voluntary drug test.

Mother said she was open to obtaining therapy for herself and Minor. The social worker gave her information about drug treatment clinics and resources for mental health services. She offered to show Mother the resource agencies in her community or take her to appointments, but Mother said E.N. would drive her.

In September 2013, the Department received a referral stating that Minor walked to and from school by herself and appeared to have to wake herself up and get herself ready for school. Staff members at Minor's school had asked Mother and E.N. several times not to allow her to walk to and from school unsupervised, but Minor continued to walk to school by herself at times, and she also walked to friends' houses by herself.

Minor told a social worker in September 2013 that, at the beginning of the summer, she had seen E.N. punch Mother's face and head and choke her by putting his arm around her neck. During that incident, Mother was crying and screaming for help and asking him to stop. E.N. told Mother to "Die! Die! Die!" while choking her. Minor was also crying, and she was so frightened that she ran underneath the bed to hide before

3

going upstairs to be with her grandmother. Minor reported that Mother and E.N. argued a lot about E.N. not helping out with the cleaning. Minor referred to E.N. as "[D]addy."[2]

When asked if she had seen anyone else hurt Mother, Minor said that there was a "black man" who was mean to her and Mother. He would lock Minor in her room, and she could hear the man and Mother fighting and yelling and Mother screaming for help and crying. Minor was frightened for Mother's sake and did not know what to do.

The social worker spoke with Mother and E.N. in September 2013. Mother did not want to let the social worker into the home. She did not believe there was anything wrong with allowing Minor to walk alone. Mother and E.N. admitted the incident when E.N. punched Mother and put her in a choke hold, but said it was an isolated incident and would not happen again. When asked about the "black man" Minor had mentioned, Mother said he had beaten her up and broken her wrist. Mother also said that after a roommate died, she had left Minor with a friend and his girlfriend, who hurt Minor by slamming the door in her face. Mother beat up the girlfriend for hurting Minor. When asked if she had arranged therapy for Minor, Mother said she had someone in mind but was still setting it up.

The Department recommended that Minor remain in Mother's care based on the social worker's opinion that it was in Minor's best interest to remain with Mother unless Mother put her at risk of further abuse or neglect or continued to refuse to participate in services. Mother failed to appear for an initial petition hearing scheduled for September 13, 2013, and the hearing was continued to September 19.

In a September 19, 2013 addendum report, the social worker stated that she had learned that Minor had not attended school since September 12, that Mother had told Minor's school principal that Minor would no longer be attending the school, and that Mother had not provided any forwarding school information.

_____

[2] In June 2013, Mother reported that she had known E.N. for six or seven months and had moved in with him six months previously.

4

**B. Detention**

Mother failed to attend the September 19, 2013 hearing, and the court issued a protective custody warrant. Minor was then placed in foster care. In the detention report, the social worker informed the court that the Department had tried to arrange supervised phone calls and supervised visitation, but Mother was belligerent and confrontational. The foster mother tried to conduct a supervised phone call between Minor and Mother, but the call ended abruptly because Mother and E.N. were "inappropriate" toward Minor and the foster mother: Mother told Minor that Minor had been kidnapped and that Minor should listen only to Mother, and E.N. told Minor to bite, kick, and punch anyone who came near her. The following day, Mother called the Department and said she knew where Minor was being held and would come and get her. The report also noted that Minor had night terrors and anxiety, that she worried about Mother's welfare as a result of the domestic violence, and that Mother had not sought treatment for her. The juvenile court ordered Minor detained.

In October 2013, Mother sought and obtained a temporary restraining order against E.N. Mother alleged that E.N. had threatened her with a propane torch in the early summer, he had punched and choked her a few weeks previously, causing two black eyes and a sore jaw, he would not let her seek medical attention, he did not let her out of his sight, he did not allow her to attend the September 13, 2013 hearing, and he had told her that if she said anything about his conduct he would make sure Minor was never returned to her custody. Mother also alleged E.N. had run after Minor on several occasions. Once, when Mother attempted to intervene, E.N. ran toward Mother, punched her, put a pillow and blanket over her face and head, and said, "Die bitch, die," and "I'm going to kill you." Mother described instances of physical abuse of Minor: She alleged that approximately two weeks previously, E.N. had grabbed Minor by the jaw, squeezed hard, and thrown her up the stairs, that he had choked Minor in early summer, and that on another occasion, he had grabbed Minor's hair and pulled hard.

5

### C. Jurisdiction and Disposition

According to an October 2013 jurisdiction/disposition report, Mother continued to refuse services offered by the Department because she did not believe in government intervention. The report detailed Minor's spotty record of school attendance, which included missing nearly two months of school between February 13 and April 9, 2013, when Mother was homeless and living "all over the Bay Area." As a result of Minor's many absences, she was academically about one year behind her grade level of second grade.

The report included additional details about the social worker's September 2013 conversation with Minor. Minor said she was responsible for getting herself out of bed and ready for school and that Mother and E.N. were usually still sleeping when she did so. Mother and E.N. slept a lot, and they were sometimes still asleep when Minor returned from school. Minor reported that Mother and E.N. fought a lot at night, and she described incidents in which E.N. physically attacked Mother. As Minor told the social worker about these incidents, she crawled under the bed. Minor also described "a black man" named Ed who had moved in without permission and had given Mother a broken arm. Ed would lock Minor in her room, and Mother would sneak into the room at night and give her food. Minor said Ed would hurt Mother and yell at her. Minor said she was frightened at this, and that "[n]ow every black man I see is him." Minor and Mother sneaked out of the apartment one night and ran away.

The social worker spoke with Mother in early October 2013, before Mother sought the restraining order against E.N. Mother acknowledged that she and E.N. had "disagreements," but denied that there was physical domestic violence. She also acknowledged that she and Minor had been held captive against their will by a man named Edward, that he abused her physically and sexually and broke her arm, and that Minor was locked in a bedroom down the hall but could probably hear her being abused. After this event, Minor was afraid to leave Mother's side, and she began having nightmares and wetting the bed.

Mother said she was open to assistance from the government as long as it was "constitutional" and "warranted." She had recently enrolled herself and Minor in MediCal, but the long processing time had delayed the beginning of Minor's therapy. Mother had inquired about counseling services through Minor's school and through a program in San Francisco. Mother said she knew Minor's exposure to abusive relationships had affected her. She said she had used no drugs except marijuana since Minor was born and that she no longer used marijuana. She refused to consent to the social worker seeing the home and declined to sign the child services case plan.

The following day, Mother told the social worker she was in an abusive relationship with E.N. and had wanted to leave him for a long time. The social worker encouraged Mother to contact an appropriate program that would help her find a domestic violence center.

The jurisdiction/disposition report described a supervised visit that took place in October 2013, in which Mother repeatedly insisted someone had cut Minor's hair and asked Minor questions about her hair; Minor became so uncomfortable she wrote a note saying "Help." A visit between Mother and Minor that took place two days later went well.

A November 15, 2013 addendum report indicated that Mother had refused to submit to random drug testing and had not signed Minor's case plan. Minor told the social worker she liked living with the foster parents, but also that she felt safe with Mother. Mother's behavior during supervised visits and telephone calls had been appropriate and supportive.

Two additional addendum reports noted that the Department had continued to encourage Mother to participate in services and participate in random drug tests. However, she had not participated in any services other than supervised visits and phone calls. Mother continued to behave appropriately and supportively during visits. She had made living arrangements that were suitable for her and Minor.

Minor's therapist reported that Minor had symptoms suggestive of a severe attachment disorder and that she needed intensive treatment.

7

On December 23, 2013, the juvenile court declared Minor a dependent child.

## D. Supplemental Petition

Minor was returned to Mother on December 26, 2013. Mother had decided not to remain in the home in which she had planned to live with Minor, but hoped to move into another home soon. The social worker told Mother to keep him informed of her whereabouts, but he learned the next day that Mother had checked out of the hotel where she had told him she would be staying. He made inquires and located her at another motel the next day. Mother was hostile and verbally abusive to him in Minor's presence. The social worker told Mother to keep him informed of her residence, but Mother failed to do so.

A supplemental petition was filed on January 22, 2014, alleging Mother had failed to maintain contact with the social worker. (§ 387.) When the social worker spoke with her on the telephone on January 7, 2014, Mother refused to disclose Minor's whereabouts, she threatened the social worker, and she said she would not do anything the Department asked her to do. Mother failed to enroll Minor in school or engage her in counseling. Minor was found and removed on January 17, 2014. The juvenile court ordered Minor detained and ordered the Department to provide visitation and therapy for Mother.

The Department prepared a jurisdiction/disposition report in February 2014. Minor had told the social worker who was then assigned to the case that during the time she was with Mother, they had stayed at a couple of hotels and the homes of some of Mother's friends. Mother had not enrolled her in a school during that time. Minor said she did not want to go to school because she did not want to get taken away again. She did not see her therapist during that time, but she said she saw her Court Appointed Special Advocate (CASA) once.

Mother told a social worker her arrangements to lease a home to live in with Minor had fallen through because of the social worker's "crazy lurking behavior." She had been unable to enroll Minor in school until she knew where they would be living; however, she said Minor had been scheduled to start school the Monday after she was

8

removed from Mother, and that she had found a woman who would help Minor in the classroom because she was afraid to go to school. Mother said she was not trying to hide Minor and that the CASA had visited the home during the time Minor was with her. Mother said the cause of the dependency was E.N.'s violence and asked why there was still a problem after she ended the relationship. She had agreed to drug testing and therapy in order to have Minor returned to her care, but believed those requirements were unrelated to the reason Minor was initially detained.

Minor's therapist told the social worker she had been trying to reach Mother unsuccessfully for almost two weeks. Mother had been told the therapist needed consent forms to be signed in order to proceed with treatment, but Mother had not provided the necessary signatures.

The report also noted that Mother and Minor are "clearly bonded to one another and display their love and affection." Mother's early life had been difficult, but she had "demonstrated her sobriety, utilized the necessary services, and provided for her child's needs. The mother managed to terminate the abusive relationship that she was recently involved in and file a restraining order to protect herself and the child."

The juvenile court sustained the allegations of the supplemental petition on February 20, 2014, ordered Minor removed from Mother's custody, and ordered reunification services for Mother pursuant to the case plan prepared by the Department. Those services were to include parenting classes, a psychological evaluation, counseling or psychiatric therapy, a substance abuse assessment, random drug and alcohol testing, a domestic violence victims' support group, and visitation with Minor. A psychological evaluation was ordered for Minor. The case plan required Mother to obtain and maintain a stable and suitable residence for herself and Minor.

## E. May 2014 Interim Review

In a May 2014 interim review report, the Department noted that Mother had missed three visits with Minor during May. She was frequently late for her visits. During visits, Mother was engaged, nurturing, and attentive to Minor's needs, and she was calmer than she had been on earlier visits.

Mother had recently reported that she had become homeless, and the social worker had given her resources to seek shelter housing. Mother had missed two appointments for a psychological evaluation and had not responded to the social worker's request that she provide dates she would be available. Mother had never been tested for alcohol and other drugs. Minor remained in foster care.

## F. Six-Month Status Review

The Department reported in August 2014 that Mother had moved to Marin County in late May in order to try to find housing. Mother had missed her visits during May, June, and part of July.[3] In June, workers who tried to call Mother found her number had been disconnected. In early July 2014, the social worker spoke to Mother, who said she had been hospitalized as a result of a kidney infection. Mother had a supervised telephone call with Minor on July 16 and visited with Minor on July 22. She had not provided any drug tests. It appeared that she had not sought counseling.

Despite Mother's failure to participate in any part of the case plan except visitation, the Department noted that Mother and Minor were bonded to each other and wanted to be together. The Department therefore recommended that Mother receive services for another six months to allow Mother time to "demonstrate her stability and sobriety." The juvenile court retained Minor in out-of-home placement and ordered reunification services for Mother.

## G. Twelve-Month Status Review

The Department submitted reports in November 2014 in connection with the 12-month status review. Mother had not followed through on referrals to drug testing between August and October. As of November 17, 2014, she had been tested for drugs only twice, producing negative results on October 29 and November 3, 2014. Mother had been given a telephone number to request counseling services on multiple occasions, but had not yet set up an appointment for therapy. Mother had been "somewhat"

_____

[3] On two of those occasions, Mother showed up for the visit; however, because she had not called to confirm she would attend, Minor was not transported to the visitation site.

consistent in her visitation with Minor. She was engaged and nurturing with Minor during visits, although she continued to press Minor to say that she was sad or that something was wrong.

In late September 2014, the social worker had met with Mother, who said she had returned to San Mateo County and was living there with her new boyfriend, who was present at the meeting. Mother continued to question the need to participate in services; however, her boyfriend asked for a list of what needed to be done so he could help Mother complete her goals.

Since that time, Mother had completed a substance abuse assessment. She told the assessor that after Minor was removed in 2013, she "took a little meth a couple of times" because of the anguish of the loss. She was currently taking an opiate painkiller due to a broken rib she said she had recently incurred while "horsing around" with her boyfriend and others in her home; she denied that the injury was the result of domestic violence. The therapist who assessed her believed an intensive outpatient program would be appropriate, but that a referral would be impracticable due to Mother's "resentment about intervention, her apparent agitated paranoia, problems with transportation, and her limited cooperation regarding drug testing."

Mother attended a psychological assessment in November 2014 and expressed her outrage at the treatment she had received from the Department. The assessor terminated the evaluation prematurely because of what he saw as Mother's "attempt[] to sabotage the evaluation with her comments and behaviors." It was his impression that Mother's "dramatic, emotional, and erratic behaviors reflected maladaptive personality traits associated with the antisocial, borderline, histrionic, and/or narcissistic personality disorders."

In light of Mother's failure to comply with her case plan, provide evidence that she no longer used drugs, or maintain a stable living environment, the Department recommended that reunification services be terminated and that a section 366.26 hearing be set to determine a permanent plan for Minor.

The CASA recommended that Minor remain a dependent of the court, and stated that until Mother began to participate in the case plan, she "would be extremely concerned about returning [Minor] to her care."

A contested hearing was set for January 22, 2015. A report prepared for the hearing noted that Mother had undergone a drug test on November 12, 2014 and the results were negative for drugs and alcohol, as had been the results on October 29 and November 3. She failed to appear for her other scheduled drug tests. Mother had been scheduled to have a psychological evaluation in early January 2015, but cancelled the appointment so she could be present when Minor had teeth extracted. A psychologist who evaluated Minor concluded she needed a safe, secure, and stable environment, and that it was "crucial to limit the extent of [her] exposure to any further conflicts, threats of violence or incidents of violence between her caregivers."

The hearing was continued, and took place on March 26, 2015. According to an addendum report the Department prepared before the hearing, Mother had been assigned to a therapist at her request, and said she had left several messages for the therapist, who did not return her calls. The social worker learned that the therapist was not accepting new patients, and she asked Mother to call the referring agency again and request a new therapist. With the exception of one occasion, Mother had continued to miss her drug tests.

Mother had been visiting Minor. She had been bringing her boyfriend to the visits, and she referred to him as Minor's "Daddy." She also had Minor speak with him during supervised phone calls. When the social worker told Mother she should not include her boyfriend in visits and phone calls because that time was for Mother and Minor only, Mother became angry and said her boyfriend was Minor's "Daddy."

Minor had been placed in a fost/adopt home. Mother sent her an email telling Minor she missed her, that she and "Daddy" were fighting for her, and that Minor should "fight too." She instructed Minor, "don't do anything except telling everyone you want to go home to us. Don't listen, don't do what anyone wants. Just say you want your

12

mom and dad because they love you and you miss them. Prove to them you want to come home." She also provided the cell phone numbers of herself and "Daddy."

At the 12-month review hearing, the social worker testified that Mother had told her that Mother's school schedule conflicted with the times the drug testing center was open. The social worker had referred Mother to another testing facility with hours that would accommodate Mother's schedule. Mother had been referred to substance abuse treatment programs, but had not attended them.

The social worker, who was assigned to the case after January 22, 2015, had observed two supervised visits. Mother's behavior toward Minor was appropriate, and Minor appeared bonded to Mother. Mother provided food and items for Minor to play with. The previous social worker also testified to Mother's appropriate behavior toward Minor during visits and their loving relationship.

Mother had told the social worker she shared a home with her boyfriend and five other roommates. The social worker had tried to schedule a meeting with Mother at the home, but Mother preferred to meet in a different location.

Mother testified that she was a full-time student at a local community college, pursuing her associate degree in business and computer science. She began her current school schedule in early February 2015, and had participated in a program called Job Train since approximately late December. She had spoken with a therapist at Job Train on a few occasions.

Mother lived with her boyfriend, another couple, and a friend of the couple, and testified that the home would be appropriate for Minor to live in; however, Minor would have to share a room with Mother and her boyfriend. Mother had applied for Section 8 housing and was seeking other resources to find affordable housing.

Mother testified she had missed her drug tests because they conflicted with her visits with Minor. After the original psychological evaluation was ended early, she saw a different psychologist for an evaluation and had nearly completed the necessary tests.

The juvenile court found that there would be a substantial risk to Minor if she were returned to Mother's care, found Mother had made minimal progress toward

13

alleviating the causes necessitating the placement, terminated reunification services, and set a hearing pursuant to section 366.26 to make a permanent plan for Minor.

## II.  DISCUSSION

Mother contends the evidence does not support the juvenile court's finding that Minor would be at risk of harm if returned to her.  She argues that the court should have either returned Minor to her or ordered further reunification services.

At the twelve-month hearing, the juvenile court is required to return the child to the parent's custody unless it finds, by a preponderance of the evidence, that the return "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. . . .  The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental."  (§ 366.21, subd. (f).)  The question of whether a return to parental custody would cause detriment "is not governed solely by whether the parent has corrected the problem which required court intervention; rather, the court must consider the effect such return would have on the child.  If returning the child will create a substantial risk of detriment to his or her physical or emotional well-being [citation], placement must continue regardless of whether the detriment mirrors the harm which had required the child's removal from parental custody [citations]."  (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 894.)

In reviewing the sufficiency of the evidence to support the juvenile court's finding that return would cause a substantial risk of detriment, we determine " ' "whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact.  All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the [finding], if possible." ' [Citation.]"  (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378–1379; accord, *In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483.)  In carrying out this review, we do not weigh the facts or consider the credibility of witnesses; those are matters for the juvenile court.  (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199–200.)

14

Mother argues that she participated in "some" services and had made efforts in the last six months to complete her case plan. In particular, she points to the fact that she attended a psychological evaluation, she provided four negative drug tests, and she tried to obtain the services of a therapist. As a result, Mother contends, either Minor should have been returned to her custody or Mother should have been offered additional reunification services.

The juvenile court found Mother had made "minimal" progress toward alleviating the causes of Minor's removal. The evidence supports this finding. Mother's case plan included parenting classes, a psychological evaluation, completion of a course of counseling or psychiatric therapy pursuant to the evaluation, random drug and alcohol testing, and visitation with Minor. Despite her history of drug abuse, Mother submitted drug tests only four times, and on every other occasion failed to provide random tests. The therapist who conducted a substance abuse assessment found that an intensive outpatient program would be appropriate for Mother, but that it would not be practical to make a referral because of Mother's resentment about intervention, her apparent paranoia, and her limited cooperation with drug testing. The psychologist who tried to carry out the initial psychological assessment was forced to terminate it, and Mother had not yet completed the requirements for a second assessment. It does not appear that Mother complied with the requirements that she complete a parenting education program.

We recognize that Mother and Minor love each other and appear to be bonded to each other, and that Mother's behavior toward Minor during visits was generally positive and supportive. However, there is also ample evidence that Minor was removed because her safety and well-being were at risk in Mother's care and that Mother had done little to address the underlying problems: Mother had a pattern of abusive relationships; at least two men had subjected her to physical or sexual violence in Minor's presence or in her hearing; Minor was visibly traumatized when discussing the abuse with a social worker; Mother had a history of drug abuse; she had not maintained a stable home; Minor had missed so much school that by the time she was in second grade, she was a year behind her peers in academic performance; and Minor was left unattended for long periods,

15

sometimes while Mother and E.N. slept. Despite these problems, Mother steadfastly refused to acknowledge her need for help or to accept the assistance the Department offered for most of the dependency, rarely appeared for required drug tests, and had only recently begun making minimal progress on her case plan. At the same time, she encouraged Minor not to cooperate with her caretakers and insisted that Mother's new boyfriend was now Minor's "Daddy" and should attend visits.[4] The juvenile court could reasonably conclude Minor would be at risk if returned to Mother's custody.

We also reject Mother's contention that the trial court should have ordered further services rather than set the matter for a section 366.26 hearing. Reunification services are generally limited to 12 months, but may be extended to 18 months if it can be shown that the objectives of the service plan can be achieved within the extended time period. (§ 361.5, subds. (a)(1)(A) and (a)(3); see *Armando L. v. Superior Court* (1995) 36 Cal.App.4th 549, 554.) As applicable here, if a child is not returned to the parent after 12 months of reunification services, the juvenile court may continue the matter for another six months only if it finds either that reasonable services were not provided or that there is "a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time." (§ 366.21, subd. (g)(1).) In order to find such a substantial probability, the court must find that the parent has visited the child consistently, that the parent has made "significant progress in resolving problems that led to the child's removal from the home," and that the parent "has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (*Ibid.*)

We have already concluded the evidence supports the juvenile court's finding that Mother had made only minimal progress on resolving the problems that led to the removal. Nor does this record compel a finding that Mother had shown the ability to

---

[4] Given Mother's history of violent relationships and of initially denying that E.N. physically abused her, it is at least of some concern that she suffered a broken rib while supposedly "horsing around" with her new boyfriend.

complete the objectives of her plan and provide for Minor's safety and well-being; rather, as we have discussed, there is evidence that Mother continued to resist her treatment and that she failed to demonstrate her sobriety and ability to maintain a safe and stable living environment. In the circumstances, the juvenile court could properly deny further reunification services.

## III.    DISPOSITION

The petition is denied on the merits. (§ 366.26, subd. (*l*)(1)(C); Cal. Rules of Court, rule 8.452(h); *In re Julie S.* (1996) 48 Cal.App.4th 988, 990–991.) The request for a stay of the July 23, 2015 hearing is denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)


_____
Rivera, J.


We concur:


_____
Reardon, Acting P.J.

_____
Streeter, J.

17